Filed 4/4/23  P. v. Chagolla CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES ANTHONY CHAGOLLA, JR.,<br><br>    Defendant and Appellant. | D079231<br><br><br><br>(Super. Ct. No. BAF1700629) |

APPEAL from a judgment of the Superior Court of Riverside County, Mark Mandio, Judge.  Reversed in part and remanded for further proceedings.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Paige B. Hazard, Andrew Mestman and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted James Anthony Chagolla, Jr., of first degree murder with the gang-murder special circumstance (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(22); count 1) and two counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 2 and 3) based on an incident in which Chagolla and a co-assailant attacked a father and son, leaving the father stabbed to death and the son wounded. The jury also found true a gang enhancement allegation (§ 186.22, subd. (b)(1)(C)) with respect to count 1.

While Chagolla's appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567), Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Assembly Bill 124), and Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518). Assembly Bill 333 made substantive revisions to section 186.22 and created section 1109, a new procedural provision requiring bifurcation of the trial of gang enhancement charges. Senate Bill 567 and Assembly Bill 124 made ameliorative changes to the determinate sentencing law (§ 1170, subd. (b)), and Assembly Bill 518 revised section 654 to expand the discretion of sentencing courts with regard to which sentences to stay and which to execute. Chagolla's challenges to the judgment are all based on these new laws.

We agree with Chagolla that Assembly Bill 333's revisions to section 186.22 apply retroactively, and so we vacate the jury's true findings on the gang-murder special circumstance and gang enhancement allegations. However, we reject Chagolla's claim that the failure to bifurcate the trial of the gang enhancement charges under new section 1109 was error and entitles

---

[1] All further unspecified statutory references are to the Penal Code.

him to reversal of the entire judgment, because we find any such error to be harmless. We remand the matter to the trial court for further proceedings, including possible retrial if the People elect to retry the gang-murder special circumstance or gang enhancement. Current sentencing law, including the changes implemented by Senate Bill 567, Assembly Bill 124, and Assembly Bill 518, shall apply at resentencing on remand.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial Evidence*[2]

A. *Prosecution Case*

1. *The Assault and Homicide of Jeremy and Assault of E.C.*

In May 2016, Jeremy C. and his wife, Norma V., moved into a housing complex (the complex)[3] located in Banning along with their newborn daughter and Norma's son, 16-year-old E.C. The complex was in an area claimed by the Eastside Banning Sapos (Sapos) criminal street gang. Two Sapos members, A.O. and his older cousin Frankie Balderas, lived in the complex.

Shortly after they moved in, Jeremy and Norma had their first encounter with Chagolla, a Sapos member. Chagolla was walking down the street as Jeremy and Norma were getting out of their car. Chagolla stared at them "really hard" and said, "Where are you guys from." When Jeremy and

---

[2] Because Chagolla does not challenge the sufficiency of the evidence to support his convictions, our factual summary is abbreviated.

[3] The complex was described as a "front house" connected to adjacent duplexes by a shared driveway. Jeremy, Norma, and their children were living in the front house.

Norma did not respond, Chagolla claimed, "Eastside Banning Sapos." Norma and Jeremy went inside their home.

Later, Norma went outside and saw Chagolla "standing on the corner [of her house] in the dark." She asked Chagolla what his problem was, and told him they were a family that just moved in and did not want any problems. She told Chagolla she "didn't feel that he should be disrespecting [them] like that." Chagolla asked, " 'Well, what's your husband's problem?' " Just then Jeremy stepped outside, but Norma told him everything was fine, and "that was it."

The family encountered Chagolla again on June 5, 2016. That day, a Balderas family reunion was held at a park near the complex. Some of those in attendance were associated with the Sapos. When the reunion ended, a small number of attendees gathered outside the complex drinking alcohol and listening to music. Among them were A.O., Balderas, Richard Garcia (another cousin of A.O. and a known Sapos member), and Jerry Valdepena (a Sapos gang member known as "Negro").

A fight broke out. And Jeremy and E.C. were assaulted, leaving Jeremy dead and E.C. wounded. A.O., Norma, and E.C. each saw different parts of the fight.

### a. *A.O.'s Testimony*

At some point after the post-reunion gathering started, Jason Rhine—the leader of the Sapos known as "Diablo"—showed up at the complex with Chagolla and a group of "youngsters." Chagolla was wearing a white shirt, while everyone else at the gathering was wearing dark clothing. A.O. knew Chagolla because in 2007, he and Chagolla had fought with members of a rival gang and they were both prosecuted as a result. Since 2007, A.O. had become a father and had distanced himself from the Sapos.

4

Rhine started a confrontation with Garcia about "something that . . . had happened between them in the past." Garcia told Rhine it was a family gathering and was not the place to be arguing. But Rhine pointed a gun at Garcia and threatened to shoot him, saying "he didn't care." As Rhine argued, Chagolla watched and stayed quiet. A.O. went inside his house because "the arguing wasn't stopping."

Around 25 or 30 minutes later, A.O. heard screaming and ran outside to see what was going on. He did not see the attack and did not see anyone armed with a knife. He saw Jeremy next to a pool of blood in the middle of the driveway.[4] Someone in a white shirt was standing five feet away from Jeremy. No one else was near him. A.O. "touch[ed]" the person in the white shirt "and everybody just started running from there." The only person wearing a white shirt that night was Chagolla.

Jeremy got up and walked to the front door of his house, where he collapsed. Norma was yelling, the "kid" E.C. had been slashed in the stomach and was crying. A.O. handed his phone to E.C. but ended up calling the police himself.

The police responded to the complex, and A.O. was taken in for questioning. At first, he told detectives "the tweaker guy" came by the complex with "a bunch of youngsters" from the Sapos gang, and the "bunch of youngsters" had attacked Jeremy. Then, he said "[t]he dude with the white shirt" was one of the assailants. Asked to identify the man in the white shirt and the "tweaker guy," A.O. resisted but then identified the man in the white shirt as Chagolla, and the "tweaker guy" as Diablo (Rhine). A.O. saw

_____

4    One witness explained the driveway of the complex connected the front house to the duplexes in the rear.

5

Chagolla fighting "for sure"; he had pushed Chagolla off Jeremy. But A.O. "didn't really see" Rhine fighting but knew he "was in the mix." A.O. did not know why they fought Jeremy, but he "ha[d] a feeling" Jeremy "came out because it was too loud and said something to these guys . . . [a]nd they said, nah, f[---] you."

At trial, A.O. testified he initially tried to protect Chagolla and Rhine's identities because he did not want the Sapos to retaliate and harm him or his family. A.O. moved away from the area after talking to the police. He failed to comply with a subpoena to testify at trial because he feared retaliation by the Sapos. He was arrested and detained as a material witness to compel his testimony.

### b.  *E.C.'s Testimony*

When E.C. and his family got home after a day of shopping, the neighbors in the back of the complex were having a small party in the driveway. The family went inside, and E.C. went to his room.

Later, E.C. heard loud voices outside. When he opened the front door, he saw Norma and Jeremy talking to Chagolla, who was wearing a white shirt, and Valdepena, whom he described as a skinny, dark-complected, Hispanic individual wearing dark clothing. E.C. heard either Chagolla or Valdepena say, "I don't like the way that you came at me. This is the Eastside Banning." E.C. believed the speaker "felt disrespected." From their posture and tone of voice, Chagolla and Valdepena seemed hostile and aggravated.

E.C. asked Norma what was going on. She told him to go back inside. Instead, E.C. stepped outside. As soon as he did, Chagolla punched Jeremy in the head, causing Jeremy to fall backwards onto the concrete. Jeremy got

6

back up, and Norma and Jeremy started fighting with Chagolla. Norma tried to get Chagolla off of Jeremy as Jeremy and Chagolla traded blows.

As Norma and Jeremy fought Chagolla, Valdepena advanced toward E.C. Valdepena pulled a folding knife out of his pocket as he approached E.C. The knife was brown with gold plating and was about five inches long. But as he got close to E.C., Valdepena tripped on the grass and fell on his back. E.C. jumped on top of Valdepena and "pancake[d]" him to keep Valdepena from fighting with Jeremy and Norma. At 260 pounds, E.C. outweighed Valdepena. While E.C. was on top of Valdepena, he could see Norma, Jeremy, and Chagolla were still fighting. Valdepena was struggling and punching him. E.C. soon realized he was being cut, and he got up and backed away from Valdepena. Valdepena stood and stared at E.C. as Jeremy and Norma continued fighting with Chagolla.

E.C. went inside to look for a phone but could not find one. When he came back out, he saw a woman fighting with Norma. Chagolla and Valdepena were attacking Jeremy with "punching motions." E.C. did not see Chagolla or Valdepena holding a knife at this point.

E.C. went back inside again to look for a phone and did not see the end of the fight. When he went back outside, Jeremy was cut up, bleeding and crawling towards the doorway of the house. Chagolla and Valdepena were gone. A man, later determined to be A.O., who had not participated in the fight approached and offered to help. A.O. called 911.

c.    *Norma's Testimony*

After they came home from shopping with their children, Norma and Jeremy sat on their front porch drinking beer. There were people in the driveway with beer bottles in their hands. At some point, Norma saw

7

Chagolla emerge from the drivers' side of a champagne-colored pickup truck that was parked nearby.

The party seemed calm at first, but then Norma heard an argument. She heard someone saying, "Just leave it alone. Don't do nothing." From her vantage point on the porch, Norma could not see who was arguing.

Norma went inside to check on the children. While inside, she heard Jeremy talking outside in what she initially thought was a conversation but then realized it was a confrontation. She heard someone asking Jeremy where he was from, if he had a problem, and if he wanted to "catch a fade," which meant get into a fight.

Norma opened the door and saw Jeremy standing in the driveway. There were two people standing in front of him: Chagolla, who was in a white shirt, and a second, dark-complected, Hispanic individual dressed in dark-colored clothing and a dark-colored baseball cap who said his name was "Negro" (Valdepena). Chagolla and Valdepena were both saying things that were designed to provoke a fight. Norma heard, " 'Well, you're the one coming to us,' or 'you're the one disrespecting us.' " Jeremy "just kept saying that he didn't want any problems" and that he "was a working man" who "wasn't from nowhere."

Norma tried to defend Jeremy by telling the men, "We have a right to be here. We pay rent." Valdepena responded, "This is my cousin's house," and both Chagolla and Valdepena claimed, "This is Eastside Banning Sapos." Chagolla and Valdepena were getting mad and came towards Jeremy.

Norma heard E.C. open the door. She turned around and told him to go inside. When she turned back to face the men, Chagolla and Valdepena had begun attacking Jeremy and were beating him up. She did not see who threw the first punch. Norma tried to separate the men from Jeremy and

8

ended up on the ground with Chagolla.  She heard Jeremy telling Chagolla, "Get off my wife."

Before Norma could get up, a woman started pulling her by the hair, and then Norma and the woman started fighting.  As she fought with the woman, Norma saw Valdepena attacking her son E.C.  Chagolla continued to fight with Jeremy and Norma saw their fight move towards the street.

Norma then saw a third person, a "tall[,] heavyset guy" in a white shirt and black hat, approach the scene carrying a knife with a wooden handle.  Norma did not see this third person approach or attack Jeremy.  But she believed the third person made a "passing motion" to Chagolla at some point, as if he were handing the knife to Chagolla.  At trial, Norma testified she saw Chagolla chasing Jeremy down the street and making "slashing motions" towards Jeremy's stomach with a wooden-handled or brown-handled knife.

At some point, Norma realized Jeremy was hurt.  She saw him making his way towards the doorway of their house.  Everybody, including Chagolla and Valdepena, scattered.  As they fled, Norma heard Valdepena tell someone, "I stabbed that fool ten times."  She did not know whether he was talking about E.C. or Jeremy.

Before trial, Norma had given different accounts of the attack to law enforcement.  When initially interviewed by detectives, she identified three suspects:  a light-complected Hispanic man who arrived in a champagne-colored Silverado pickup truck (Chagolla); a second, dark-complected, Hispanic individual wearing a hat, who called himself "Negro" (Valdepena); and a third heavyset individual wearing a hat and white shirt and carrying a wooden-handled knife.  During this interview, she said the third heavyset person was the one who attacked her son.  She also said she did not see who

9

stabbed Jeremy, but she saw Chagolla and Valdepena attacking Jeremy, and she heard Valdepena say, "I stabbed 'em ten times."

In a later interview, Norma again said Jeremy had been attacked by the man who arrived in the Silverado pickup truck (Chagolla) and the dark-complected man who called himself "Negro" (Valdepena), but she said E.C.'s assailant was one of these two people. When asked to describe the clothing of the man in the pickup truck, she said he had been wearing a white shirt.

At the preliminary hearing, Norma testified she saw Chagolla chasing Jeremy in the street, but she did not see any weapons in Chagolla's hands.

At trial, Norma testified her memory was better than it was when she testified at the preliminary hearing. She explained that in preparing to testify at trial, she had reviewed her prior statements, and they had refreshed her memory.

2.    *Additional Evidence*

Police responded to the complex within minutes of receiving a call of an assault or stabbing. When the first officer arrived, Jeremy was unable to communicate, and he soon fell unconscious.

Despite medical attempts to save him, Jeremy died from his injuries. He had sustained stab wounds (puncture injuries greater in depth than width) and incised wounds (slashing injuries greater in width than depth) to his right arm, chest, and torso, as well as an incised wound to his face. He suffered a total of 20 stab and incised wounds. The cause of death was multiple sharp injuries, and the mechanism of death was internal and external bleeding. Four stab wounds to the abdomen were the primary injuries that led to Jeremy's death. It was not possible to determine whether Jeremy's wounds were caused by one knife or more than one knife.

E.C. sustained multiple lacerations to his shoulders and chest, including a cut on his shoulder that required five or six staples, and a chest wound that required eight staples.

The DNA profiles of Chagolla and Valdepena matched DNA found on beer cans collected from the complex in the aftermath of the assault and homicide. A latent fingerprint on one of the recovered beer cans matched that of Rhine.

Sometime before the homicide, a California Highway Patrol officer had pulled over Chagolla while he was driving a light-colored Chevy Silverado pickup truck. After the homicide, officers conducting a welfare check at the residence of Chagolla's wife found Chagolla with his light-colored Chevy pickup truck.

3. *Gang Evidence*

Investigator B. Smith of the Banning Police Department testified as the prosecution's gang expert. During his 10-year tenure with the police department, Smith had been a detective with the department's gang investigation unit and had received specialized training on criminal street gangs, specifically on gangs that operated in the City of Banning.

Smith defined "criminal street gang" as a group of three or more individuals who identify under a common sign or symbol and "commit crimes to benefit themselves and the gang[.]" Criminal street gangs make money by selling narcotics, stealing, and committing fraud. Establishing and protecting turf is important to criminal street gangs, including to ensure their dominance in areas where they make drug sales. Criminal street gangs want a reputation "of instilling fear in the general public and showing their superiority over other rival gangs." Committing crimes of violence in the community is one way of developing this reputation.

11

Gang members "represent" their gang by claiming gang membership while committing crimes, flashing gang signs, identifying their home turf, and announcing their gang moniker during the commission of a crime. Gang members who admit gang membership and openly expose themselves to legal liability develop a positive reputation within the gang. Gang members who do not "represent" their gang can develop a reputation for being soft and risk being assaulted by other gang members.

Gang members are taught they and their gang should be respected. Disrespect can include not acknowledging them as the people in control of the gang's claimed turf. There had been many instances in which a person who was not a gang member could be "called out or asked where they're from" by members of a criminal street gang. "And just the way you respond, don't respond, or look at them, or don't acknowledge them could result in a violent confrontation." "[B]acking up your gang" means that "if one of your members that you're with . . . gets involved in a confrontation with somebody for whatever reason it may be . . . , if he gets into a fight, you're going to get into the fight with him." Gang members who back up their gang develop a positive reputation within the gang. A person who cooperates with the police can get labeled as a "snitch or rat," which can result in the person being attacked or killed.

Smith opined the Sapos qualified as a criminal street gang within the meaning of section 186.22. The Sapos was the most active gang in Banning and had approximately 50 active members. It used common signs and symbols to identify itself, claimed the City of Banning as its territory, and had several rival gangs in the area. Smith testified Rhine was the Sapos's leader, and that Chagolla, Valdepena, Garcia, and Balderas were all active Sapos members.

Smith further opined the charged crimes had been committed for the benefit of the Sapos. The assault occurred at a location where a documented member of the Sapos was living; there was a gathering that included several documented members of the Sapos; and a fight broke out between the Sapos members and a person living at that location. Telling someone to "keep it down" could be taken as a sign of disrespect by gang members. By yelling out their gang name, the individuals involved in the assault were "making it known . . . [that] this area was Eastside Banning Sapos turf" and were "show[ing] that claim of turf[.]" Smith testified that "due to the issues of respect, putting in work, and backing your gang," the individuals involved in the attack on Jeremy and E.C. committed the crimes in association with other Sapos gang members and for the benefit of the Sapos.

Smith further opined that committing crimes listed in section 186.22, subdivision (e), was one of the primary activities of the Sapos. He testified to six predicate offenses to demonstrate the Sapos had a pattern of criminal activity:

(1) In 2000, Rhine pled guilty to assault with a deadly weapon and admitted the crime was committed for the benefit of or in association with "gang members," based on an incident in which he and another Sapos member stabbed someone during a fight.

(2) In 2007, Chagolla, A.O., and two other Sapos members attacked two rival gang members, and one of the rival gang members was stabbed. Chagolla pled guilty to attempted murder and admitted the crime was committed for the benefit of, at the direction of, or in association with members of the Sapos.

(3)     In 2012, Gabriel Herrera, an active Sapos member, pled guilty to assault with force likely to produce great bodily injury and admitted a prior strike.

(4)     In April 2013, Chagolla, Clancy McCafferty, and other Sapos members were investigated for a walk-up shooting of a house. Each of the individuals involved admitted to the commission of crimes relating to this incident. Chagolla pled guilty to discharge of a firearm. McCafferty pled guilty to assault and admitted the crime was committed "for . . . gang purposes[.]"

(5)     In November 2013, McCafferty and another Sapos member stabbed a Sapos member who was not in good standing with the gang. McCafferty pled guilty to assault with a deadly weapon with a gang enhancement.

(6)     A jury found Joseph Lavoie, an active Sapos member, guilty of robbery.

B.     *Defense Case*

The defense called the police officer who arrived first at the scene and spoke with Norma. Norma told this officer she did not recognize either of the people who fought with Jeremy and she had not had any problems with them in the past.

## II.

### *Jury Verdict and Sentencing*

In October 2019, a jury convicted Chagolla of first degree murder with the gang-murder special circumstance (§§ 187, subd. (a), 190.2, subd. (a)(22); count 1) and two counts of assault with a deadly weapon (§ 245, subd. (a)(1);

counts 2 and 3).[5] As to count 1, the jury found true Chagolla personally used a deadly and dangerous weapon (a knife) in the commission of the murder (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)) and found true he committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). As to count 2, the jury found true Chagolla personally used a deadly and dangerous weapon (a knife), in the commission of the assault (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)) and personally inflicted great bodily injury on Jeremy (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)).[6] In a bifurcated proceeding, the trial court found that Chagolla had suffered a prior strike conviction.

In February 2021, the trial court sentenced Chagolla on count 1 to a term of life in prison without the possibility of parole for the first degree special circumstance murder, plus an additional year for the deadly weapon enhancement.[7] On count 2, the court imposed a total prison term of 12 years (consisting of the upper term of four years for the assault, doubled to eight

[5]    Jeremy was the named victim of the assault charged in count 2; E.C. was the named victim of the assault charged in count 3.

[6]    Each of the three counts charged in the operative information included a gang enhancement allegation pursuant to section 186.22, subdivision (b)(1). The parties assert that the jury returned not true findings with respect to the gang enhancement allegations charged in connection with counts 2 and 3. As we explain in footnote 9, the parties appear to have overlooked a discrepancy in the verdict forms for these findings.

[7]    The court did not impose a term for the gang enhancement, explaining section 186.22, subdivision (b)(1)(C), was not applicable given the length of the sentence already imposed on count 1. (See, e.g., *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236–1239 ["when the defendant has been convicted of a felony that already carries a life sentence, there is no specific enhancement [under section 186.22, subdivision (b)(1),] for a term of years"].)

years due to the strike prior, plus three years for the great bodily injury enhancement, and one additional year for the deadly weapon enhancement) but stayed execution of this term pursuant to section 654. On count 3, the court imposed a total prison term of eight years (consisting of the upper term of four years for the assault, doubled due to the strike prior). Chagolla's total sentence was nine years plus life without the possibility of parole. He timely appealed.

## DISCUSSION

### I.

*The Jury's True Findings on the Gang Enhancement Allegation and Gang-Murder Special Circumstances Allegation Will Be Vacated in Light of Amended Section 186.22*

A.    *Assembly Bill 333*

While this appeal was pending, Assembly Bill 333 amended section 186.22 so as to change the substantive requirements for imposing the gang-crime sentencing enhancement. The revisions to section 186.22 implemented by Assembly Bill 333 require us to vacate the jury's gang enhancement finding under section 186.22, subdivision (b)(1)(C), as well as its gang-murder special circumstance finding under section 190.2, subdivision (a)(22) (section 190.2(a)(22)).

" 'In 1988, the Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act; § 186.20 et seq.) to eradicate "criminal activity by street gangs." ' [Citation.] Among other things, the STEP Act created 'a sentencing enhancement for a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" (. . . § 186.22, subd. (b)(1)).' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1205–1206 (*Tran*).)

16

Effective January 1, 2022, "Assembly Bill 333 made the following changes to the law on gang enhancements:  First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.'  (§ 186.22, subd. (f), italics added.)  Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang.  (§ 186.22, subd. (f), italics added.)  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)"  (*Tran*, *supra*, 13 Cal.5th at p. 1206.)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.  If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense."  (*Tran*, *supra*, 13 Cal.5th at p. 1206.)

17

B.    *The Amendments to Section 186.22 Require That the Jury's True Finding on the Count 1 Gang Enhancement Allegation Be Vacated*

Chagolla contends, and the People concede, that Assembly Bill 333's amendments to section 186.22 apply retroactively to Chagolla, and require that we vacate the jury's true finding on the gang enhancement allegation attached to count 1. We agree.

Under the *Estrada* rule, absent evidence to the contrary, courts presume statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final on the statute's operative date. (See *People v. Frahs* (2020) 9 Cal.5th 618, 624–626; *People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada* (1965) 63 Cal.2d 740, 742–745 (*Estrada*).) In *Tran*, the California Supreme Court held that by increasing the threshold for imposition of a gang enhancement pursuant to section 186.22, Assembly Bill 333 is ameliorative and therefore retroactive under the *Estrada* rule. (*Tran, supra*, 13 Cal.5th at pp. 1206–1207.)

The amendments to section 186.22 require reversal of the jury's gang enhancement finding on count 1. "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra*, 13 Cal.5th at p. 1207.) The jury was not instructed in accordance with the elements of the statute as revised. The prosecution's evidence failed to meet the requirements of section 186.22 as newly amended, including that the predicate offenses used to establish the requisite " 'pattern of criminal gang activity' " benefitted the Sapos in a way that was more than reputational. (See § 186.22, subd. (e)(1).) Given these deficiencies, we cannot conclude beyond a reasonable doubt that the jury's

18

finding would have been the same in the absence of the error. As a result, we will vacate the true finding on the count 1 gang enhancement pursuant to amended section 186.22, subdivision (b)(1)(C).

As both sides agree, we conclude the People must be given the opportunity to retry this allegation under the newly amended version of section 186.22. As another court has explained, " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial. [Citations.] " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' " ' " (*People v. Sek* (2022) 74 Cal.App.5th 657, 669–670 [prosecution not barred from retrying defendant on gang enhancement allegations reversed due to the Assembly Bill 333 amendments to section 186.22]; see *People v. Lopez* (2021) 73 Cal.App.5th 327, 346 ["the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22"].) On remand, the prosecution may retry Chagolla on the count 1 allegation pursuant to the current version of section 186.22, subdivision (b)(1)(C).

C.  *The Jury's Gang-Murder Special Circumstance Finding Will Also Be Vacated*

The jury's true finding on the gang-murder special circumstance allegation pursuant to section 190.2(a)(22) is also affected by Assembly Bill 333's amendments to section 186.22. Section 190.2(a)(22) provides that a defendant shall be subject to death or a term of life without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant

19

was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Thus, section 190.2(a)(22) expressly incorporates the statutory definition of "criminal street gang" set forth in section 186.22, subdivision (f). Chagolla argues section 190.2(a)(22) has also been substantively amended by Assembly Bill 333 and requires the jury's gang-murder special circumstance must also be vacated.

The People oppose reversal of the gang-murder special circumstance finding on constitutional grounds. They argue subdivision (a)(22) was added to section 190.2 in 2000 as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. (*People v. Shabazz* (2006) 38 Cal.4th 55, 65 (*Shabazz*).) Subdivision (c) of article II, section 10 of the California Constitution restricts the Legislature from amending "an initiative statute by another statute" unless the subsequent statute is "approved by the electors" or "the initiative statute permits amendment . . . without the electors' approval." There is no dispute Assembly Bill 333 did not meet this criterion. (See *People v. Lopez* (2022) 82 Cal.App.5th 1, 18.) Thus, the People contend, Assembly Bill 333's amendments to section 186.22 constitute an unconstitutional amendment to a voter initiative if applied to section 190.2(a)(22).

On this question, two courts have reached different conclusions, and the issue is now before the California Supreme Court. In *People v. Rojas* (2022) 80 Cal.App.5th 542, review granted October 19, 2022, S275835, a divided panel in the Fifth Appellate District agreed with the Attorney General and held, "allowing Assembly Bill 333's changes to section 186.22 to affect section [190.2(a)(22)] would constitute an impermissible amendment of Proposition 21." (*Id.* at p. 547 (maj. opn. of Poochigian, J.); but see *id.* at

20

pp. 558–561 (conc. & dis. opn. of Snauffer, J.).) By contrast, the Second Appellate District has held Assembly Bill 333 did not unconstitutionally amend section 190.2(a)(22) because it neither prohibited what Proposition 21 authorized, nor authorized what Proposition 21 prohibited. (*People v. Lee* (2022) 81 Cal.App.5th 232, 245, review granted Oct. 19, 2022, S275449 (*Lee*).) We agree with *Lee* and conclude the amendments to section 186.22, if applied to section 190.2(a)(22), do not constitute an unconstitutional amendment of Proposition 21.

"In deciding whether [a] particular [statutory] provision amends [a voter initiative], we simply need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571 (*Pearson*).) What the voters intended to authorize or prohibit by the initiative "is a question of statutory interpretation. When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*Ibid.*) In short, " '[t]he voters should get what they enacted, not more and not less.' " (*Ibid.*)

We are not the first court to examine the voter intent underlying Proposition 21. The California Supreme Court has "had occasion in past decisions to review at length the findings and declarations that were set forth

as part of [Proposition 21]." (*Shabazz, supra*, 38 Cal.4th at p. 65.) As the *Shabazz* court explained, "[t]he voters intended to address gang-related crime generally," and, as relevant here, " 'to punish all gang crime more severely.' " (*Ibid.*, quoting *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 905–908 (*Robert L.*).) The ballot measure announced: " 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties.' " (*Shabazz*, at p. 65, quoting Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (h), p. 119 (Ballot Pamphlet).)

As part of Proposition 21, voters amended section 186.22 to increase the sentences for the gang enhancements set forth in subdivisions (b), (c), and (d), and amended existing section 190.2 to add subdivision (a)(22)—at issue here—to include gang-related murder in the list of special circumstances allowing the imposition of death or life without the possibility of parole. (See Ballot Pamphlet, text of Prop 21, pp. 119, 120, 122; *Lee, supra*, 81 Cal.App.5th at pp. 242–244.) Notably, in enacting Proposition 21, the voters changed only the punishments relating to then-existing laws on gang crimes.

The amendments to section 186.22 implemented by Assembly Bill 333 do not conflict with the voters' intent in enacting Proposition 21. In passing Assembly Bill 333, the Legislature explained proponents of the STEP Act "claimed the prosecution would be unable to prove an offense was committed for the benefit of, or in association with, a gang 'except in the most egregious cases where a pattern of criminal gang activity was clearly shown.' " (Stats 2021, ch. 699, § 2, subd. (e).) The Legislature determined, however, that the STEP Act was "continuously expanded through legislative amendments and court rulings," leading to "ubiquitous" application. (*Ibid.*) The Legislature thus expressed concern that former section 186.22 was, at times, misapplied

22

to "social networks of residents in neighborhoods." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) The Legislature also found "[c]urrent gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live," in part because "[t]he social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs." (*Id.* at subds. (a), (d)(8); see also *id.* at subd. (d)(7) ["People frequently receive gang enhancements based on the conduct of other people whom they have never even met."].)

Assembly Bill 333's amendments to section 186.22 reverse that course. The additional requirements set forth in amended section 186.22 ensure the enhancements are applied to crimes that are truly related to patterns of criminal gang activity, as opposed to individual crimes committed by persons merely associated with "social networks of residents in neighborhoods." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) The amendments do not change the length of the sentences imposed, nor do they remove gang-related murder from the list of special circumstances making a qualifying defendant eligible for death or life without the possibility of parole. They simply ensure the increased punishments provided in sections 186.22 and 190.2(a)(22) are applied to the type of criminal conduct the voters intended to address in Proposition 21; that is, crimes that are directly related to criminal street gangs and gang activity. In doing so, Assembly Bill 333's amendments do not prohibit what Proposition 21 authorized (longer sentences for gang-related crimes), or authorize anything that Proposition 21 prohibited. (See *Pearson, supra*, 48 Cal.4th at p. 571.)

The People concede Assembly Bill 333 did not directly change the language of section 190.2(a)(22). But they argue that " 'where a statute

adopts by specific reference the provisions of another statute . . . such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.' " (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58–59 (*Palermo*); see also *In re Oluwa* (1989) 207 Cal.App.3d 439, 445 [applying *Palermo* in the context of a statutory amendment to a voter initiative]; *People v. Kelly* (2010) 47 Cal.4th 1008, 1048–1049 [same].)  Based on this rule, known as the *Palermo* rule, the People contend that by incorporating the definition of "criminal street gang" from section 186.22, subdivision (f), into section 190.2(a)(22), the voters intended to adopt the definition solely as it existed when Proposition 21 passed in 2000.

We disagree.  This rule of statutory construction is not applied mechanically, rigidly, or in isolation. (See, e.g., *In re Jovan B.* (1993) 6 Cal.4th 801, 816, fn. 10 ["Several modern decisions have applied the *Palermo* rule, but none have done so without regard to other indicia of legislative intent."]; *Lee, supra*, 81 Cal.App.5th at p. 241 [*Palermo* rule is not mechanically applied].)  In *Palermo* itself, our high court set forth an equally significant rule: " '[W]here the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time.' " (*Palermo, supra*, 32 Cal.2d at p. 59.)  And as the Court has since explained, "when the statutory words themselves 'do not make clear whether [the statute] contemplates only a time-specific incorporation, "the determining factor will be . . . legislative intent." ' " (*People v. Anderson* (2002) 28 Cal.4th 767, 779.)

Like the court in *Lee*, we conclude "the voters did not contemplate a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special-circumstance statute." (*Lee*, *supra*, 81 Cal.App.5th at p. 241.) Nothing in Proposition 21 or the Ballot Pamphlet suggests the voters intended to limit the Legislature's ability to amend the statutory definitions set forth in section 186.22, subdivisions (e) or (f). Indeed, by acknowledging the newly amended definitions apply retroactively in other contexts, the People implicitly concede the voters left the definitions in section 186.22 open to further amendment by the Legislature. Yet the People claim the voters intended to freeze the same definitions by incorporating section 186.22, subdivision (f), into section 190.2(a)(22).

We are not persuaded. As the court in *Lee* observed when addressing this issue, "the electorate clearly knew how to express the intent to freeze a statutory definition." (*Lee*, *supra*, 81 Cal.App.5th at p. 243.) In two other instances, Proposition 21 expressly stated references to existing statutes were " 'to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act.' " (*Ibid.*, italics omitted; see also Ballot Pamphlet, *supra*, text of Prop. 21, §§ 14, 16, pp. 123–124.) But newly added section 190.2(a)(22) did not similarly incorporate the definition of criminal street gang in section 186.22, subdivision (f), as it existed on the effective date of Proposition 21. In short, there is simply no indication the voters contemplated "a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special-circumstance statute." (*Lee*, at p. 241; see also *id.* at pp. 241–243.) "It is not our role to rewrite the initiative by inserting language the drafters

25

never included and the voters never considered." (*People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 284 (*Gooden*).)

Contrary to the interpretation of Proposition 21 advanced by the People, the ballot materials evince an intent by the voters to conform, at all times, the statutory definitions of gang-related crimes across section 186.22 and section 190.2(a)(22). (See Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, pp. 46 [stating, "[t]his measure increases the extra prison terms for gang-related crimes . . . [and] adds gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty"], 47 [stating the proposition "[i]ncreases penalties for gang-related crimes," without distinguishing between the felony sentencing enhancements and the newly added gang-murder special circumstance (italics omitted)]; see also *Robert L.*, *supra*, 30 Cal.4th at p. 906 ["As with ballot pamphlet arguments, a reviewing court may look to a ballot's legislative analysis to determine voter intent."].) In short, "[t]here was no distinction suggesting that what constitutes a 'gang-related' murder was frozen in time for section [190.2(a)(22)], but what constitutes a 'gang-related felony' for section 186.22 was not." (*Lee*, *supra*, 81 Cal.App.5th at p. 244.) We agree with the court in *Lee* that "the term 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (See *id.* at p. 245.)[8]

The People assert Proposition 21 did not just change the penalty for gang-related crimes. Rather, "it *created* the special circumstance provision

---

[8] The People acknowledge this court reached a similar conclusion in *Gooden*, *supra*, 42 Cal.App.5th at pages 288 to 289. We are not persuaded by their effort to distinguish *Gooden* as a case involving an initiative that did not incorporate another statutory definition by reference.

where none had previously existed." This is a distinction without a difference. In enacting Proposition 21, the voters did not *create* special circumstance murder. Rather, as the Ballot Pamphlet explains, the voters "*add*[*ed*] gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty." (Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46, italics added.) The voters' intent in doing so was to increase the penalties for gang-related crimes, including murder. That intent is not undermined by ensuring the increased penalties of death and life without the possibility of parole are imposed on persons that commit a true gang-related murder. (See *Gooden*, *supra*, 42 Cal.App.5th at p. 288.)

In sum, the intent of the voters in passing Proposition 21 was to increase penalties for gang-related felonies and murders. By enacting Assembly Bill 333, the Legislature sought to focus those increased penalties on crimes that are truly related to patterns of criminal gang activity, the type that likely animated voters to enact Proposition 21 in the first instance. (See *Lee*, *supra*, 81 Cal.App.5th at p. 245 ["in Assembly Bill 333, the Legislature redefined the term 'criminal street gang' so as to truly target the population of criminals for which an enhanced punishment is warranted"].) Construing section 190.2(a)(22) in a manner that allows the incorporated statutory definition of criminal gang activity to evolve concurrently with section 186.22 achieves the goals of both the voters and the Legislature. We therefore conclude Assembly Bill 333 does not unconstitutionally amend section 190.2(a)(22).

The retroactive application of Assembly Bill 333 affects not only the jury's gang-crime enhancement finding under section 186.22, subdivision (b)(1)(C), but also its gang-murder special circumstance finding under section 190.2(a)(22). Consequently, we will vacate the jury's special circumstance

27

finding pursuant to section 190.2(a)(22). On remand, the People shall also be given the opportunity to retry Chagolla on this allegation. (See *Lee*, *supra*, 81 Cal.App.5th at p. 245 [vacating the gang-murder special circumstance finding under section 190.2(a)(22) and remanding to afford the People the opportunity to retry the allegation].)

D.    *Any Error Arising from the Failure to Bifurcate the Trial of the Gang Enhancement Allegations Under Newly-Added Section 1109 Was Harmless*

In addition to revising section 186.22, Assembly Bill 333 also created section 1109, a new bifurcation procedure. Section 1109 provides, in relevant part, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases[.]" (§ 1109, subd. (a).) The question of defendant's guilt of the underlying offense shall be determined first. (§ 1109, subd. (a)(1).) If the defendant is found guilty, "there shall be further proceedings to the trier of fact on the question of the truth of [any] enhancement" under section 186.22, subdivisions (b) or (d). (§ 1109, subd. (a)(1) and (2).)

Chagolla contends section 1109 applies retroactively to his case under *Estrada* and requires reversal of the entire judgment. He further contends the failure to bifurcate the trial of the gang enhancement allegations was either structural error or, if reviewable for prejudice, was prejudicial under any standard.

The People respond that Chagolla has forfeited any claim of error under section 1109 because he failed to move for bifurcation of the gang enhancement allegations in the trial court. They further assert that even if Chagolla has not forfeited this challenge, section 1109, unlike other provisions of Assembly Bill 333, does not apply retroactively because it is a procedural provision that operates only prospectively. Finally, they argue

28

that even if section 1109 applies retroactively, reversal is not warranted because the failure to bifurcate the gang enhancement allegations in this case was harmless.

Appellate courts are currently divided as to whether section 1109 applies retroactively, and this issue is now before the California Supreme Court. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567, review granted July 13, 2022, S274743 [§ 1109 applies retroactively under *Estrada*]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 (*Ramos*) [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 105–108 (*Montano*) [same]; with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090 [holding § 1109 is not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341 [same]; *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [same].) In *Tran*, the California Supreme Court declined to resolve this split, finding that any error in failing to bifurcate the trial of the gang enhancements was harmless. (*Tran*, *supra*, 13 Cal.5th at p. 1208.) We take a similar approach here. Even assuming section 1109 applies retroactively and Chagolla preserved this issue for appeal, we conclude he was not prejudiced by the failure to bifurcate the trial of the gang enhancement allegations.

Chagolla's claim of structural error was presented for the first time in his reply brief without a showing of good cause for the delay, and it is forfeited as a result. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219 [" '[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party' "]; *People v. Gonzalez* (2020) 57 Cal.App.5th 960, 978 [it is "well established that arguments may not ordinarily be raised on appeal for the first time in a reply

29

brief"].) Also, his reply brief was filed after the California Supreme Court issued its decision in *Tran*. In *Tran*, our high court rejected the contention that failure to bifurcate a trial pursuant to section 1109 constitutes structural error. (*Tran*, *supra*, 13 Cal.5th at p. 1208.) We adhere to this holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In *Tran*, the Court also rejected the defendant's claim that the failure to bifurcate gang enhancement allegations in accordance with section 1109 necessitated review under the heightened *Chapman* standard. (*Chapman v. California* (*Chapman*) (1967) 386 U.S. 18, 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt].) The *Tran* court explained, " '[t]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.' " (*Tran*, *supra,* 13 Cal.5th at p. 1209.) Finding no such fundamental unfairness in the use of gang evidence in the defendant's trial, the Court applied the *Watson* standard for reviewing state law error. (*Tran*, at p. 1209; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reversal is required only if the defendant shows it is reasonably probable a more favorable result would have been reached in the absence of the error].)

We similarly conclude the admission of gang evidence did not render Chagolla's trial fundamentally unfair, and that the failure to bifurcate the trial of the gang enhancement allegations was harmless under the *Watson* standard. First, we agree with the People that even if the trial had been bifurcated, the gang evidence would have been independently admissible in a trial of the remaining offenses to prove the gang-murder special circumstance allegation. "[N]othing in Assembly Bill 333 limits the introduction of gang

30

evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see *People v. Chhoun* (2021) 11 Cal.5th 1, 31 (*Chhoun*) ["The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense."].)  As the *Montano* court recently explained:  "Section 1109 says nothing about the special circumstance statutes, and its provisions are specific to section 186.22, subdivisions (a), (b), and (d).  Moreover, the procedures required by section 1109 conflict with the procedures set forth in section 190.1 et seq." (*Montano*, *supra*, 80 Cal.App.5th at p. 109; see § 190.4, subd. (a) ["Whenever special circumstances . . . are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance.  [¶] . . . [¶]  If the trier of fact finds that any one or more of the special circumstances . . . as charged is true, there shall be a separate penalty hearing[.]"].)  Thus, "section 1109, as originally enacted by Assembly Bill 333, does not apply to the determination of special circumstance allegations under section 190.2(a)(22)."  (*Montano*, at p. 114.)

Chagolla does not respond to this point in his reply brief.  In short, because the gang evidence was cross-admissible to prove the gang-murder special circumstance allegation, bifurcation of the gang enhancement allegations under section 1109 would not materially have affected the scope of gang evidence presented during the trial of the remaining charges.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 (*Hernandez*) ["[t]o the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled"]; *People v. Osband* (1996) 13 Cal.4th 622, 667 [if evidence is cross-admissible, prejudice is dispelled].)

31

Additionally, given the facts of the case, "it is likely some, though not all of the [gang] evidence . . . would have come in at a trial on just the substantive offenses" (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132) to prove such issues as motive and intent, and to explain the circumstances surrounding the offenses (see *ibid.*; Evid. Code, §§ 352, 1101, subds. (b), (c); *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 (*Olguin*) [evidence of defendants' gang membership and gang activities was "highly relevant to the prosecution's theory of how and why [the victim] was killed"]; *People v. Ramirez* (2022) 13 Cal.5th 997, 1096 [introduction of gang evidence proper "where the defendant himself identifies gang affiliation as a motive"]).  Gang evidence, " 'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like— can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 31, quoting *Hernandez*, *supra*, 33 Cal.4th at p. 1049.)  Further, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and . . . [a]n explanation of the basis for the witness's fear is likewise relevant to [his] credibility[.]"  (*People v. Burgener* (2003) 29 Cal.4th 833, 869, citations omitted.)

Chagolla criticizes *Hernandez* and *Olguin* as cases of "yesteryear" that relied on the admissibility of gang-related evidence under Evidence Code section 1101, analysis he claims is outmoded following Assembly Bill 333. Although we do not dismiss the concerns underlying Assembly Bill 333, in enacting Assembly Bill 333, the Legislature did not go so far as to grant criminal defendants the right to a trial sanitized of all gang-related evidence. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132 ["[N]othing in Assembly Bill 333

limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges."].)  The *Tran* court, when explaining why the failure to bifurcate a gang enhancement allegation under section 1109 is not structural error requiring automatic reversal in every case, observed:  "We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime. (*People v. Williams* (1997) 16 Cal.4th 153, 194.)" (*Tran*, *supra*, 13 Cal.5th at p. 1208; see *Williams*, at pp. 193–194 [trial court did not err in admitting gang evidence where relevant to motive and identity; the probative value of the evidence was not outweighed by its prejudicial effect], citing Evid. Code, § 1101.)  The Court's observation together with its reliance on *Williams* confirm that gang-related evidence remains admissible on grounds authorized by Evidence Code section 1101, subdivision (b), even after the passage of Assembly Bill 333.

Chagolla argues the evidence of his guilt of the substantive charges left room for doubt because of contradictions in witness testimony, primarily on the subject of his possession of a knife.  This argument overlooks that the prosecution primarily relied on the theory he aided and abetted the assaults and murder.  In this regard, the evidence of Chagolla's guilt was overwhelming.  (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [trial court's failure to bifurcate gang enhancement allegations pursuant to section 1109 not prejudicial under *Watson* where evidence of guilt on underlying charges was overwhelming].)  Three eyewitnesses identified Chagolla as one of the assailants who participated in all stages of the violent attack that resulted in Jeremy sustaining 20 knife wounds.  E.C. testified without contradiction that Chagolla started the fight; fought with both Norma and Jeremy while E.C. "pancaked" the second assailant; and was continuing to

33

attack Jeremy when E.C. returned outside for the first time. A.O. was consistent in testifying to facts that supported the identification of Chagolla as the person closest in proximity to Jeremy at the end of the fight. And notwithstanding prior inconsistent statements, Norma was unvarying at trial in her claims that Jeremy was attacked by two men, and she consistently identified Chagolla, the driver of a champagne-colored Silverado pickup truck, as one of these two assailants. This aspect of her testimony was corroborated by the evidence Chagolla was stopped while driving a light-colored Silverado pickup truck, and that such a truck was registered to his wife and was found with him at the time of his arrest. Norma also testified without contradiction that when she tried to defend Jeremy, Chagolla attacked her, supporting the reasonable and uncontested inference Chagolla perceived anyone who might intervene on Jeremy's behalf as a foe to be met with violence.

In short, the evidence resoundingly supported the identification of Chagolla as an active, persistent, and unyielding participant in an attack so grisly and unsparing it left Jeremy eviscerated and lying in a pool of blood in the complex driveway, and Norma's teenaged son wounded and bleeding. Further, it was uncontradicted Chagolla fled to Arizona after the assaults. (See *People v. Singleton* (1987) 196 Cal.App.3d 488, 492 ["Factors relevant to a determination of whether defendant was guilty of aiding and abetting include: presence at the scene of the crime, companionship, and conduct before and after the offense."].) Even without the gang evidence, the evidence of Chagolla's guilt as an aider and abettor of the assault and murder of Jeremy and the assault of E.C. was overwhelming.

Finally, although two of the predicate crimes introduced to prove a pattern of criminal gang activity involved Chagolla, they were no more

34

inflammatory than the charged crimes. When the evidence of the predicate crimes was introduced, the court gave the jury a limiting instruction, which we presume it followed. (See *Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) Although the prosecutor relied heavily on the gang evidence, given that this evidence was admissible in any event, we do not find that this circumstance compels reversal. Other aspects of the record do not persuade us Chagolla was prejudiced.[9]

In sum, we conclude it is not reasonably probable Chagolla would have reached a more favorable result in the absence of the asserted error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

---

[9] In this regard, we disagree with Chagolla's claim that the jury's findings on the gang enhancement allegations attached to counts 1, 2, and 3 were irreconcilably inconsistent. This claim relies on the assertion that whereas the jury returned a true finding on the gang enhancement allegation attached to count 1, it simultaneously returned not true findings with respect to the gang enhancement allegations attached to counts 2 and 3. As it turns out, however, it was the verdict forms, not the jury's findings, that were inconsistent. The pre-printed verdict form for the count 1 gang enhancement allegation stated, in relevant part, that the jury "find[s] that the defendant . . . *did commit* [the crime charged in count 1 of the operative information] for the benefit of . . . a criminal street gang . . . ," whereas the pre-printed verdict forms for the counts 2 and 3 gang enhancement allegations stated, in relevant part, that the jury "find[s] that the defendant . . . *did not commit* [the crime charged in count 2/ count 3 of the operative information] for the benefit of . . . a criminal street gang . . . ." (Italics added.) Although all parties, including the trial court, interpreted the jury's "not true" findings on the counts 2 and 3 gang enhancement allegations as rejections of those allegations, in fact the findings contained a double negative: in each case, the jury found it was "*not* true" that Chagolla "did *not* commit" the assaults for the benefit of a criminal street gang. The People failed to notice this discrepancy and have long since forfeited any challenge they might have brought to the court's interpretation of the counts 2 and 3 gang enhancement findings. In any event, accurately read, the jury's findings on the counts 1, 2, and 3 gang enhancement allegations were not irreconcilable.

## II.

*The Current Versions of Sections 1170 and 654 Shall Apply*

*When Chagolla Is Resentenced on Remand*

In February 2021, when Chagolla was sentenced, section 1170, former subdivision (b), left it to the sentencing judge's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.) In sentencing Chagolla, the trial court selected upper-term sentences for counts 2 and 3. At the sentencing hearing, the court discussed several factors it regarded as aggravating and found these factors warranted imposition of the upper term. Because counts 1 and 2 involved the same victim, Jeremy, the court stayed execution of the 12-year sentence imposed on count 2 in favor of the life sentence imposed on count 1 pursuant to the then-current version of section 654.

While this appeal was pending, section 1170 was modified by two pieces of legislation. The first is Senate Bill 567, which made significant amendments to the determinate sentencing law under section 1170, former subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Bifurcation of such jury findings is also now required. (*Ibid.*)

The second is Assembly Bill 124, which, as relevant here, amended the determinate sentencing law by making the lower term presumptive in certain

36

circumstances, including where the defendant "has experienced psychological, physical, or childhood trauma," or where the defendant was a youth at the time of the commission of the offense,[10] and the defendant's youth or trauma "was a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6)(A), (B); see § 1016.7, subd. (b) [defining "youth" as "any person under 26 years of age on the date the offense was committed].) Where the presumption applies, the court must apply the lower term unless it "finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).)

Section 654 was also recently amended. Effective January 1, 2022, Assembly Bill 518 modified section 654 to provide in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1, italics added.) Previously, under section 654, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379; *People v. Jones* (2022) 79 Cal.App.5th 37, 45.) "As amended by Assembly Bill 518, . . . section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*Mani*, at p. 379.)

---

10    Chagolla was 25 years old on June 5, 2016, when the charged offenses were committed.

Chagolla claims the recent amendments to sections 1170 and 654 are ameliorative and therefore retroactive under *Estrada*, requiring us to vacate his sentence and remand for resentencing. The People agree these amendments are retroactive, but they oppose resentencing. They argue any error in failing to apply the current version of section 1170, subdivision (b)(2), was harmless; that the trial court "implicitly" found imposition of the lower term on any counts, as authorized by the current version of section 1170, subdivision (b)(6), would be contrary to the interests of justice; and that there is no possibility the court would have exercised the discretion afforded by the current version of section 654 to stay Chagolla's indeterminate sentence on count 1 in favor of the shorter determinate sentence imposed on count 2. Chagolla opposes these positions.

Because we are remanding the matter for further proceedings, we need not resolve the parties' disputes. Chagolla will have to be resentenced on remand,[11] and the trial court will be required to apply current sentencing law at the time of resentencing. As a result, Chagolla will have the opportunity to argue before the sentencing court that he is entitled to the benefit of the amendments to sections 1170, subdivision (b), and 654.

## DISPOSITION

The jury's true findings on the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C) (count 1), and the gang-murder special circumstance allegation pursuant to section 190.2(a)(22) (count 1) are

---

[11] On remand, "the resentencing court has jurisdiction to modify *every* aspect of the sentence, and not just the portion" that was the basis of the resentencing hearing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) The only restriction is that the new sentence must be no more severe than the original one. (*People v. Hanson* (2000) 23 Cal.4th 355, 358–360.)

38

vacated. The matter is remanded to the superior court. On remand, the People shall have the opportunity to retry the count 1 gang enhancement allegation and gang-murder special circumstance allegation in conformance with current law. The court shall then resentence Chagolla in light of the outcome of those proceedings, and in accordance with the sentencing laws in effect at the time of resentencing. In all other respects, the judgment is affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


BUCHANAN, J.

39